**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| **HARRIS DAVIS REBAR, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **17 C 6473** |
| | ) | |
| **STRUCTURAL IRON WORKERS** | ) | |
| **LOCAL UNION NO. 1, PENSION** | ) | **Judge John Z. Lee** |
| **TRUST FUND,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiff Harris Davis Rebar, LLC ("HDR") has filed a motion for protective order and sanctions [51]. That same day, Defendant Structural Iron Workers Local Union No. 1, Pension Trust Fund ("the Fund") filed a motion seeking to compel HDR to comply with Federal Rule of Civil Procedure 26(b)(5) [43]. For the reasons stated herein, Plaintiff's motion [51] is granted in part and denied in part, and Defendant's motion [43] is granted.

**Factual and Procedural Background**

HDR filed this action in September 2017, seeking a declaratory judgment that it is not required to pay contributions to the Fund under the Employee Retirement Income Security Act ("ERISA") and the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. § 1381 *et seq.* HDR is a national corporation that is "principally engaged in the placement of reinforcing steel (rebar) in concrete construction projects throughout the United States." Compl. ¶ 28, ECF No. 1. The

Fund is a "multiemployer defined benefit pension fund" administered under 29 U.S.C. § 186(c)(5). Compl. ¶ 25. HDR contends that it has never been required to pay contributions to the Fund, but that the Fund has sought to hold it accountable for withdrawal liability under ERISA anyway.

The Fund's position centers on HDR's relationship to two other corporate entities, neither of which are parties to this action—Davis J.D. Steel, LLC ("DJD") and Old Chicago Steel, LLC ("Old Chicago"). HDR purchased some assets from DJD in November 2012. Compl. ¶ 47. But, according to HDR, that purchase is immaterial, because DJD "never operated in" the territorial jurisdiction of the Structural Iron Workers Local Union No. 1 ("Local 1"). *Id.* ¶ 51.

The Fund does not quibble with this statement such as it is, but claims that DJD and Old Chicago were essentially the same entity, and that Old Chicago *did* do work in Local 1 prior to 2012. *Id.* ¶ 36. Thus, as the Fund sees it, HDR is a successor or an alter ego of either DJD or Old Chicago and, therefore, is subject to withdrawal liability. *See* Answer ¶ 57, ECF No. 23. What is more, the Fund contends that HDR, DJD, and Old Chicago structured the 2012 asset sale as a "fraudulent transaction" intended to "avoid paying any contributions or withdrawal liability to defined benefit pension funds across the country," including the Fund. Def.'s Resp. Pl.'s Mot. Sanctions at 3, ECF No. 59.

This is not the first or even second time these parties have litigated HDR's liability under ERISA. In July 2014, HDR brought a declaratory judgment action

seeking the same relief it does now. The parties agreed to dismiss that case without prejudice. *See Harris Davis Rebar, LLC v. Structural Iron Workers Local Union No. 1 Pension Tr. Fund*, No. 14 C 5873 (N.D. Ill. filed July 31, 2014). After that, the Fund commenced an arbitration against DJD and Old Chicago (and not HDR), which continued for several years. Then, in June 2017, the Fund filed a lawsuit against HDR under the successor-in-interest and alter ego theories. *See Structural Iron Workers Local Union No. 1 Pension Trust Fund v. Harris Davis Rebar, LLC*, No. 17-C-4922 (N.D. Ill. filed June 30, 2017). That suit is pending before this Court.

While the 2014 lawsuit was ongoing, attorneys for the Fund took a series of actions that are the subject of the parties' present motions. According to HDR, on November 3, 2014, the Fund's attorneys Jeffrey Krol and Joseph Mallon (both of the firm Johnson & Krol, LLC) met with Roger Struble, who was a former member, co-manager, and vice president of HDR, as well as a former employee of DJD. Pl.'s Mem. Supp. Mot. Sanctions at 3, ECF No. 53. Struble, who had resigned from HDR in March 2014, "transferred to Fund counsel more than 3,000 emails (plus over 1500 attachments to those emails) to which Struble had access while employed" with HDR ("the Struble Documents"). *Id*. at 3–4. HDR asserts that these documents included "thousands of confidential and/or privileged emails and other documents," as well as "hundreds of privileged communications reflecting discussions that [HDR] and/or [DJD] had with their attorneys or discussions about legal advice provided by those attorneys." *Id.* at 4. The Fund did not disclose its receipt of these documents to

HDR at that time.

The Fund admits that its attorneys received documents from Struble, but characterizes the exchange as resulting from Struble's unsolicited outreach to the Fund. Def.'s Resp. Pl.'s Mot. Sanctions at 2. According to the Fund, Struble first contacted "an Employer Trustee for the Pension Fund" in or around August 2014. *Id.* Krol indicates that he then "researched whether he could communicate with Struble, a former constituent of Old Chicago, [DJD] and HDR" and "determined that it would not violate any ethical rules." *Id.* Krol also had a telephone conversation with Struble on August 14, 2014, to confirm that Struble was no longer an officer or employee of HDR, DJD or Old Chicago. *Id.* Krol claims that he, Mallon, and Struble then met at a restaurant in Chicago on November 3, 2014. *Id.* at 3.

At the meeting, Struble allegedly described his belief that the "transaction between Old Chicago/[DJD] and HDR was set up to avoid paying any contributions or withdrawal liability to defined benefit pension funds across the country, including [the Fund]." *Id.* at 3. Struble then, "without any request from the [Fund's] counsel, showed [Krol] printed out emails regarding the fraudulent transaction." *Id.* Struble later visited Johnson & Krol's office and provided the lawyers with "all of the emails he had on his personal computer." *Id.*

HDR says it was not aware that Struble had provided the Fund with these documents until July 2017, when counsel for DJD and Old Chicago (who were still engaged in arbitration with the Fund) informed HDR that the Fund had cited in a

pleading what appeared to be privileged and confidential documents belonging to HDR. Pl.'s Mem. Supp. Mot. Sanctions at 5 n.2. HDR's attorney, Michael Congiu, says he contacted Krol, who confirmed that he had received the Struble Documents but declined to provide copies to Congiu. *Id.*

The Fund finally produced the Struble Documents to HDR in March 2018 during discovery in this case. *Id.* at 5. Since then, it has identified Struble as a potential witness in this matter and indicated that it may rely on the Struble Documents to support its defenses to HDR's claims. *Id.* HDR concluded that many of the documents were confidential or privileged, so it asked the Fund not to use the Struble Documents in this litigation. *Id.* at 6. The Fund would not agree. *Id.*

Accordingly, HDR has filed a motion seeking to prohibit the Fund from relying upon the Struble Documents in this case and to sanction it for its surreptitious receipt of the documents. HDR also contends that Johnson & Krol should be disqualified from representing the Fund; that the Fund should be directed to destroy all copies of the Struble Documents and records that reference or were derived from them; that the Fund should be barred from using any information derived from the Struble Documents; that the Fund should be barred from relying on Struble as a witness; and that HDR should be awarded its attorneys' fees and costs incurred as a result of the bringing of its motion. *Id.* at 1.

The Fund, for its part, acknowledges that some of the Struble Documents contain conversations between HDR and its counsel, but it argues that HDR must

produce a privilege log pursuant to Rule 26(b)(5) if HDR intends to assert attorney-client privilege as a basis to withhold the documents. Def.'s Mot. Compel ¶¶ 10–13, ECF No. 43. And so the Fund has asked the Court to compel HDR's compliance with Rule 26(b)(5). *Id.* ¶ 15.

## **Legal Standards**

### I. Sanctions

A court may issue sanctions against a party who violates the rules of discovery in order to penalize the wrongdoer and to deter future misconduct. *See Dotson v. Bravo*, 321 F.3d 663, 667 (7th Cir. 2003). Rule 37(c)(1) states, "If a party fails to provide information . . . as required by Rule 26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." In addition, or alternatively, the Court may impose other sanctions up to and including dismissal of the action. Fed. R. Civ. P. 37(b)(2), (c)(1). The Court also has inherent power aside from Rule 37 to impose sanctions for bad-faith conduct. *Rhodes v. LaSalle Bank, N.A.*, No. 02 C 2059, 2005 WL 281221, at *2 (N.D. Ill. Feb. 1, 2005).

Discovery sanctions are called for only when willfulness, bad faith, or fault is shown. *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992). "Bad faith" is characterized by intentional or reckless misconduct; "fault" by the degree of reasonableness of the conduct. *Id.* Additional considerations include whether and to what extent the opposing party was prejudiced by the improper conduct and the

proportionality of the sanction to the conduct. *Rhodes*, 2005 WL 281221, at *2.

Disqualification of an attorney may be an appropriate sanction for violation of the attorney's ethical or other duties, but it is a "drastic measure which courts should hesitate to impose except when absolutely necessary." *Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir. 1983). Courts must carefully balance the attorney's misdeeds with "the prerogative of a party to proceed with counsel of its choice." *Id.* Motions to disqualify should be "viewed with extreme caution for they can be misused as techniques of harassment." *Freeman v. Chi. Musical Instrument Co.*, 689 F.2d 715, 722 (7th Cir. 1982).

## II. Compliance with Rule 26(b)(5)

The federal notice pleading system contemplates that parties will have broad discovery to investigate the facts and help define and clarify the issues. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *United States v. Farley*, 11 F.3d 1385, 1390 (7th Cir. 1993). Accordingly, Rule 26(b)(1) gives parties expansive power to discover information "regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Relevant information need not be admissible at trial so long as it appears reasonably calculated to lead to the discovery of admissible evidence. *Id.*; *see also Kuttner v. Zaruba*, 819 F.3d 970, 974 (7th Cir. 2016) (discovery is appropriately limited to "focus only on capturing information reasonably calculated to lead to relevant evidence").

Because of the presumption in favor of broad discovery, a party seeking to

withhold documents subject to a privilege bears the burden of establishing that the privilege applies. *United States v. BDO Seidman*, 337 F.3d 802, 811 (7th Cir. 2003). Under Rule 26(b)(5), a party withholding otherwise discoverable information must (1) expressly make a claim of privilege, and (2) "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5). Similarly, if allegedly privileged material has already been produced, the party asserting the privilege must notify the receiving party "of the claim and the basis for it." *Id.* The asserting party should generally provide this information in a privilege log, which should identify for each document: (1) the date, (2) the author and recipients, including their capacities; (3) the subject matter of the document; (4) the purpose for its production; and (5) a specific explanation of why it is privileged. *Naik v. Boehringer-Ingelheim Pharm., Inc.*, No. 07 C 3500, 2008 WL 4866015, at *3 (N.D. Ill. June 19, 2008).

**Analysis**

HDR contends that Krol's and Mallon's conduct in obtaining the Struble Documents violated several ethical duties and, thus, warrants sanctions, including disqualification and a bar prohibiting the Fund from relying on the Struble Documents or Struble himself. In response, the Fund argues that its lawyers' conduct was justified and did not violate any ethical rules, and that it should be permitted to rely on evidence from Struble. What is more, the Fund disputes HDR's

characterization that any of the Struble Documents are privileged, but to the extent they are, the Fund argues that HDR should be required to provide a privilege log in accordance with Rule 26(b)(5).

## I. ABA Model Rule 4.4(b)

HDR relies primarily on case law interpreting the American Bar Association Model Rule of Professional Conduct ("ABA Model Rule") 4.4, which deals with an attorney's duties with respect to the rights of third persons.[1] ABA Model Rule 4.4(b) states that a lawyer who receives a document or electronically stored information relating to the representation of the lawyer's client, and who knows that the information was sent inadvertently, "shall promptly notify the sender." Comment 2 to the Rule, however, explains that it does not address "[w]hether the lawyer is required to take additional steps" beyond notifying the sender; nor does the Rule apply to the receipt of information that, although unauthorized, is not the result of inadvertence. *See also* ABA Formal Ethics Opinion 06-440 (explaining that a lawyer's unsolicited receipt of privileged or confidential materials from a knowing sender is "beyond the scope" of Rule 4.4(b)).

Courts in this district have previously concluded that—although ABA Model Rule 4.4(b) does not explicitly extend to situations involving intentionally-sent privileged or confidential information—an attorney's duty in that scenario remains

[1] Illinois Rule of Professional Conduct 4.4 is materially indistinguishable from the parallel ABA Model Rule, and this Court has generally adopted the ABA Model Rules. *See* Local Rule 83.50.

the same. For example, in *Chamberlain Group, Inc. v. Lear Corporation*, 270 F.R.D. 392 (N.D. Ill. 2010), the plaintiff's counsel obtained documents from a former employee of the defendant and had reason to believe that the documents were privileged or confidential. *Id.* at 393–96. The court concluded that sanctions were warranted because the plaintiff had failed to promptly notify the defendant of the documents' receipt. *Id.* The court "fail[ed] to see why [the duty to disclose] should cease where confidential documents are sent intentionally and without permission." *Id.* at 398.

Other courts are in agreement. *See Raymond v. Spirit AeroSystems Holdings, Inc.*, No. 16-1282-JTM-GEB, 2017 WL 2831485, at *14 (D. Kan. June 30, 2017) (holding that plaintiff's counsel "had a duty to, at minimum, immediately notify defendants of the disclosure"); *Burt Hill, Inc. v. Hassan*, No. Civ.A. 09-1285, 2010 WL 419433, at *4–5 (W.D. Pa. Jan. 29, 2010) (same); *see also Xyngular v. Schenkel*, 890 F.3d 868, 874–875 (10th Cir. 2018) (upholding sanctions imposed on shareholder-defendant who improperly "bypassed the judicial process" by obtaining confidential information from an employee of the company-plaintiff in anticipation of litigation), *petition for cert. filed* (U.S. Oct. 29, 2018) (No. 18-479); *Webb v. CBS Broad., Inc.*, No. 08 C 6241, 2011 WL 1743338, at *12 (N.D. Ill. May 6, 2011) (explaining that the principle of Rule 4.4—"respect for the rights of others"—carries an obligation to deal candidly with an opposing party about documents that are plainly confidential).

This makes a lot of sense. Although ABA Model Rule 4.4(b), on its face, applies only to documents inadvertently provided by the sender, the Court—like others before it—"frankly finds it nonsensical to apply a separate and lesser standard to intentionally-disclosed documents," *Raymond*, 2017 WL 2831485, at *14, particularly where the sender is a former officer of an adverse party. After all, it must be remembered that, in such circumstances, the privilege does not belong to the officer or employee, but to the principal. *Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 277 (N.D. Ill. 2004) (citing *CFTC v. Weintraub*, 471 U.S. 343, 349 (1985); *Hayes v. Burlington N. & Santa Fe Ry. Co.*, 752 N.E.2d 470, 474 (Ill. App. Ct. 2001); *see also* Model Rule 1.13(a). And while the ABA Committee on Ethics and Professional Responsibility does not go so far as to "assume" that privileged information—the kind that rightfully belongs to the principal but is intentionally provided to an adversary by an agent or former agent without the principal's authorization—can be said to be "inadvertently sent" by the principal within the meaning of Rule 4.4(b), *see* ABA Formal Ethics Opinion 06-440, such an extension is not at all farfetched and seems eminently reasonable.

Furthermore, even if Rule 4.4(b) can be read not to apply in this context at all, an attorney's obligations do not end with Rule 4.4(b). As the ABA has recognized, "[t]he Rules do not exhaust the moral and ethical considerations that should inform a lawyer['s conduct.]" ABA Formal Ethics Opinion 06-440. *See Raymond*, 2017 WL 2831485, at *9 ("ABA sources acknowledge that a lawyer's receipt of materials sent

intentionally but from an unauthorized source is a matter of law beyond the scope of Rule 4.4(b)"). Other considerations include the rules governing discovery, as well as other ethical rules, such as those involving communication with represented persons under Model Rule 4.2 (a discussion of which follows), fairness to the opposing party under Model Rule 3.4, and candor to the tribunal under Model Rule 3.3.

Thus, the principles underlying Rule 4.4(b), as well as "obligations of decency, fundamental fairness, and frankly the golden rule, should" prompt a lawyer in this situation to "notify [the opposing party] in order to avoid problems later." *Raymond*, 2017 WL 2831485, at *14. A lawyer who knows he is skirting the line of attorney-client privilege "proceed[s] at [his client's] peril" whether he receives the documents inadvertently or intentionally. *Burt Hill*, 2010 WL 419433, at *4. The same is true when it comes to confidential or proprietary information. "[I]t is generally an improper litigation tactic to use a disgruntled employee to secretly obtain non-public internal business documents from an opposing party." *Chamberlain Grp.*, 270 F.R.D. at 398 (internal quotations and citations omitted).

Here, the Fund's attorneys were approached by someone they knew to be a former officer and director of HDR, who necessarily would possess a great deal of confidential and privileged information. What is more, the lawyers admit that the substance of their conversation with Struble, and some of the documents he provided to them, did reveal conversations HDR had with its own counsel on legal and corporate matters. *See* Def.'s Resp. Pl.'s Mot. Sanctions at 8 ("Struble intentionally

and voluntarily produced the emails to the [Fund's] counsel to blow the whistle on a fraud being perpetrated by his former companies with the assistance of counsel."). In other words, Krol and Mallon accepted the Struble Documents with full awareness that they likely contained privileged or confidential material. The attorneys should not have accepted these documents without, at a minimum, notifying counsel for HDR. *See Chamberlain Grp.*, 270 F.R.D. at 398.

The Fund tries to distinguish *Chamberlain* on the basis that it involved "multiple conversations" with the ex-employee, while the Fund's counsel "had a single meeting with Struble, [and] received one set of documents on one occasion." Def.'s Resp. Pl.'s Mot. Sanctions at 9. But it appears that Krol spoke with Struble over the phone and met him in person at least twice, including at counsel's office. *Id.* at 2–3. Whatever the case, the Fund's attorneys undoubtedly knew that Struble might provide confidential or privileged information, but did nothing to alert HRD. That is the point of *Chamberlain*.

Similarly, the Fund argues that *Raymond* and *Burt Hill* are not persuasive because they involved anonymous sources rather than known individuals. But it is difficult to see why that would matter. Indeed, the *Raymond* court looked to *Chamberlain* and similar cases and held that parties must notify their opponents upon receiving "clearly unauthorized" material. *Raymond*, 2017 WL 2831485, at *14; *see Burt Hill*, 2010 WL 419433, at *5.

The Fund also points to *Chesemore v. Alliance Holdings, Inc.*, 276 F.R.D. 506 (W.D. Wis. 2011), where the district court declined to hold that Rule 4.4(b) applied to intentional-but-unauthorized disclosures. *Id.* at 515. But this Court respectfully declines to follow *Chesemore* for several reasons. First, in *Chesemore*, the lawyers did not directly participate in obtaining confidential materials, like the Fund's counsel here. *Chesemore*, 276 F.R.D. at 515; *see Raymond*, 2017 WL 2831485, at *11–12. Second, *Chesemore* dealt with an attorney's fitness to be class counsel under Rule 23, rather than the scope of an attorney's obligations during discovery. Third, the *Chesemore* court limited its analysis to the plain language of Model Rule 4.4(b), noting that no party "attempt[ed] to articulate" any reasons to extend the rule beyond unintended disclosures. *Chesemore*, 276 F.R.D. at 515; *see Raymond*, 2017 WL 2831485, at *12. But it is difficult to see how the concerns giving rise to Model Rule 4.4(b) are not greater, as opposed to less, when the unauthorized disclosure of confidential and privileged information is intentional, rather than accidental, and the attorney who receives the information actively acquired it. The holder of a privilege is no less harmed if its agent or former agent—without its knowledge or consent—provides privileged information to opposing counsel intentionally, rather than unintentionally.

## II. ABA Model Rule 4.2

If any doubt that the Fund's counsel overstepped their ethical boundaries remains, one need only consider ABA Model Rule 4.2. Quite apart from a lawyer's

obligations with respect to information sent from third parties, ABA Model Rule 4.2 restricts a lawyer's ability to communicate with constituents of a represented entity.[2] And, while it is true that the rule does not expressly prohibit a lawyer from communicating with a *former* constituent, Comment 7 warns that a lawyer may not communicate with even a former employee in a way that "violate[s] the legal rights of the organization" and directs readers to Rule 4.4.

Thus, read together, Rules 4.2 and 4.4 allow an attorney to communicate with a former constituent, but limits those communications to non-confidential and non-privileged information. This obligation to avoid infringing a represented entity's attorney-client privilege when meeting with a former agent of that entity is well-established. *See Orlowski v. Dominick's Finer Foods, Inc.*, 937 F. Supp. 723, 728 (N.D. Ill. 1996) (reminding lawyers that while they may meet with nonclient former constituents, they may not discuss "any privileged information to which they were privy"); *see also Tomasian v. C.D. Peacock, Inc.*, No. 09 C 5665, 2012 WL 2590493, at *7 (N.D. Ill. July 3, 2012) (same); *E.E.O.C. v. Univ. of Chi. Med. Ctr.*, No. 11 C 6379, 2012 WL 1329171, at *4 (N.D. Ill. Apr. 16, 2012) (same); Restatement (Third) of the Law Governing Lawyers § 102 (2000) ("A lawyer communicating with a nonclient . . . may not seek to obtain information that the lawyer reasonably should

[2] As with ABA Model Rule 4.4, Illinois Rule of Professional Conduct 4.2 is virtually identical to the parallel ABA Model Rule.

know the nonclient may not reveal without violating a duty of confidentiality to another imposed by law.").

For these reasons, the Court finds that the Fund's attorneys violated their ethical obligations by meeting with Struble, actively discussing with him matters they knew were likely to be confidential or privileged, and requesting and obtaining such information from him.

## III. Privileged Nature of the Struble Documents

As an argument of last resort, the Fund contends that the obligations described above do not apply because the Struble Documents are not privileged. The documents, it argues, either do not concern conversations between HDR and its counsel, or, if they do, those conversations are evidence of a crime or fraud committed with the assistance of counsel. *See* ABA Model Rule 1.6(b)(2) (the "crime-fraud exception" to attorney-client privilege). But the existence of the privilege is for the Court, not counsel, to determine. *See, e.g.*, *Raymond*, 2017 WL 2831485, at *15 (explaining that a party receiving documents from a former constituent "sidesteps the orderly discovery process, and inappropriately permit[s] . . . counsel to be the ultimate gatekeeper" of "claims of confidentiality and privilege"); *Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1316 (D. Utah) ("It was inappropriate for the [lawyers] to unilaterally decide whether the documents were proprietary, confidential, or privileged[.]").

The Fund's attorneys themselves characterize the Struble Documents as containing conversations between HDR and its counsel concerning its legal obligations with respect to ERISA, as well as other corporate matters. Accordingly, even if an exception to privilege were to ultimately apply, the Fund was well aware that many of Struble Documents would at least be the subject of a *claim* of privilege or confidentiality. As such, its attorneys should have notified opposing counsel when they received the documents, and they should have refrained from speaking to Struble about potentially privileged or confidential matters.

**IV. Sanctions**

While a number of district courts have addressed this issue, neither the Seventh Circuit nor the Supreme Court has spoken on an attorney's duty with respect to the intentional but unauthorized disclosure of confidential or privileged information obtained from a third-party. What is more, the Court accepts the representations by the Fund's counsel that they researched the ethical and legal implications of doing so and believed themselves justified. Accordingly, the Court finds that this is not a case in which the "drastic measure" of disqualification is "absolutely necessary." *Schiessle*, 717 F.2d at 420; *see Burt Hill*, 2010 WL 419433, at *6 (denying motion to disqualify where the attorneys sought ethical advice before accepting unauthorized documents).

That said, the attorneys' actions were reckless—at the very least—given the case law in this district and elsewhere. Instead of notifying HDR's counsel when

they received the Struble Documents, as they should have done, the Fund's attorneys waited over three years to do so, and the passage of time has prejudiced the ability of HRD to circumscribe the harm.

Accordingly, weighing the totality of the circumstances before it, the Court finds that the following sanctions are necessary and appropriate to address the harm to HDR. First, the Fund is ordered to destroy any and all copies of documents or electronically stored information that it received from Struble, as well as any records, notes, or other documents that reference or were derived from them. The Fund may not use the information derived from the Struble Documents unless it independently receives that information through discovery or as further discussed below. The Court declines to bar the Fund from calling Struble as a witness, but cautions the Fund that it must refrain from eliciting any testimony that would infringe on HDR's attorney-client privilege or disclose confidential trade secret information. To the extent HDR objects to specific testimony, those objections can be dealt with as they arise. Furthermore, the Fund is ordered to reimburse HDR its reasonable attorney's fees and costs associated with bringing the motion for sanctions. HDR shall provide a statement to the Fund's counsel of the fees it seeks, and the parties shall endeavor to resolve the amount. If the parties cannot agree, then HDR may file a motion asking the Court to set the amount.

## V. Privilege Log

The Fund has moved to compel HDR to comply with Federal Rule of Civil Procedure ("Rule") 26(b)(5) in the event that HDR seeks protection of any of the Struble Documents. HDR responds that the conduct of the Fund's attorneys was so egregious that it should not be required to undertake the cumbersome task of producing a privilege log to stop the Fund from using its improperly-obtained documents. The Court has not required HDR to produce a privilege log before deciding that sanctions are warranted for the Fund's attorneys' conduct, so to some degree, the Court agrees with HDR. But to the extent that HDR is asking the Court to sanction the Fund by relieving HDR of its obligation to create a privilege log for any Struble Document that is responsive to discovery requests propounded by the Fund in this case, that request is denied.

Accordingly, to the extent any of the Struble Documents contain information that is relevant and responsive to the Fund's discovery requests, HDR must produce the documents or provide a privilege log for any documents that it withholds under a claim of privilege.[3] In other words, the Fund's motion to compel compliance with

[3] Furthermore, to the extent that any of the Struble Documents contain relevant and responsive information that would constitute a confidential trade secret, HDR should produce it subject to a protective order or file a motion under Rule 26(c). The Court will address HDR's objections to the scope of the Fund's discovery requests, as raised through the Fund's motion to compel [44], in a separate order.

Rule 26(b)(5) is granted, and HDR must provide the Fund with a privilege log in accordance with Rule 26(b)(5) within 28 days.

## **Conclusion**

HDR's motion for a protective order and sanctions [51] is granted in part and denied in part as stated above. The Fund's motion to compel compliance with Rule 26(b)(5) [43] is granted. HDR must provide the Fund with a privilege log in accordance with Rule 26(b)(5) within 28 days.

Date: 2/5/19 /s/John Z. Lee